IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CORA ARMSTRONG, SADIE SIMS,       )
and KINNIE SIMPSON,               )
                                  )
        Plaintiffs,               )
                                  )
v.                                )      CIVIL ACTION NO.
                                  )      04-0448-BH-B
STANDARD FURNITURE, THOMAS        )
CASKEY, and EDDIE DENSON,         )
                                  )
        Defendants.               )

**FINDINGS OF FACT; CONCLUSIONS OF LAW;
AND ORDER**

This action is before the Court on defendants' respective motions (Docs. 45-47 and

50-52) for summary judgment.  In connection therewith, the individual defendants have

filed a motion to strike (Doc. 59) plaintiffs' response on the grounds that plaintiffs violated

this Court's Local Rule 7.1(b) by exceeding its page limitation, and the plaintiffs responded

thereto by filing a motion (Doc. 61) to exceed such page limitation.  Upon consideration of

the latter motions, the Court concludes and it is therefore **ORDERED** that defendants'

motion to strike is due to be and is hereby **DENIED** while plaintiffs' motion to exceed the

page limitation is due to be and is hereby **GRANTED**.  The Court further concludes, upon

consideration of the motions for summary judgment, plaintiffs' opposition thereto (Doc.

57-58), defendants' respective replies (Docs. 60 and 62), and all other pertinent portions

of the record, that defendants' motions for summary judgment are due to be granted.

## FINDINGS OF FACT

The Court has considered all the evidence of record, both testimonial and documentary, and finds that the following material facts are undisputed or uncontradicted by the plaintiffs.

1.      Standard Furniture operates a furniture manufacturing facility in Frisco City, Alabama, and a larger facility in Bay Minette, Alabama.

2.      Standard Furniture has a policy prohibiting all types of employment discrimination, including sexual harassment.  (Rudd Decl. at Ex. 1).  Standard Furniture's sexual harassment policy defines harassment as "unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex" and gives numerous examples of behavior that may constitute harassment.  (*Id*.)  The policy further provides that any employee who believes she has been harassed should "immediately notify the Director of Human Resources . . . . There will be no retaliation against anyone for reporting discrimination or harassment, or for cooperating with an investigation of a complaint of discrimination or harassment."  (*Id*.)

3.      Standard Furniture distributes its sexual harassment policy to all employees at orientation.  In addition, Standard Furniture periodically conducts meetings with employees where it reiterates, *inter alia*, its sexual harassment policy.  All three Plaintiffs admitted they knew about the company's policy and how to report harassment.[1]

---

[1]Plaintiffs attended classes on the subject and signed off and/or received multiple anti-harassment policies from 2000 to 2002. Sims: (1) signed an acknowledgment indicating her receipt of a copy of the policy on two separate occasions, once in 2000, and again in 2002 (Sims Dep. at 33, 34,  41 and Exhs. 2, 5, and 6); (2) attended two

4.      Thomas Caskey, one of the defendants herein, was the machine room superintendent.  (Rudd Dep. at 24).  Eddie Denson, the remaining defendant herein, was a supervisor at the Standard Furniture plant.  Caskey was Denson's "boss."  (Armstrong Dep. at 77).  Denson's employment terminated in August 2004.

## SADIE SIMS

5.      Sadie Sims, one of the plaintiffs in this case, worked for Standard Furniture on three occasions.  Sims first worked at the Frisco City plant when the plant was owned by Frisco Manufacturing.  (Sims Dep. at 19).   Sims returned to the plant in early 2000.  (Sims Dep. at 27-28).  She left Standard to have surgery, and was rehired six weeks later on October 3, 2000.  (Sims Dep. at 30).  In 2001, Sims became a quality control ("QC") inspector of the machine room.  (Sims Dep. at 62-63). Sims is still employed as a QC inspector and receives $9.00 per hour.

6.      Sims never reported any sexual harassment during her first three years of employment.  (Sims Dep. at 37).  Sims admits that Thomas Caskey, the Machine Room Superintendent, was never her supervisor.  (Sims Dep. at 50-51).  Sims' claim of sexual harassment by Caskey is based upon three occasions.  The first was when Caskey allegedly

---

EEO/Anti-Harassment classes on October 18, 2001 and a subsequent date (Sims Dep. at Exh. 3; Rudd Aff. at Exh. 6); (3) refused or failed to attend one in February 2004 (Rudd Aff. at Exh. 11); and (4) acknowledged that Josh Rudd, the Human Resources Manager, was the contact person if an employee had a complaint under the anti-harassment policy (Sims Dep. at 31-35).  Armstrong: (1) attended EEO/Anti-Harassment training classes on October 22, 2001, January 24, 2002, and May 20, 2003 (Armstrong Dep. at Exh. 4; Rudd Aff. at Exhs. 4 and 5); and (2) acknowledged receiving the company's sexual harassment policy on August 11, 1999 (Rudd Aff. at Exh. 22).  Simpson: (1) testified that she was aware of the anti-harassment policies and the fact that she was to report any complaints to Mr. Rudd (Simpson Dep. at 16); attended EEO/anti-harassment classes on October 22, 2001, January 24, 2002, and May 20, 2003 (Simpson Dep. at 69-71; Rudd Aff. at Exhs. 3, 4 and 5); and (3) acknowledged receiving the anti-harassment policy on February 16, 2000 (Simpson Dep. at 70-71 and Exhs. 5 and 6).

asked Sims what she was doing after work. (Sims Dep. at 35). Sims admitted, however, that

Caskey and other employees and supervisors socialized after work over drinks and dinner.

(Sims Dep. at 48-50). Additionally, on one of the three occasions about which Sims

complains, Caskey simply asked Sims to give him Spanish lessons as Sims speaks Spanish.

(Sims Dep. at 45-46). Sims declined and admits that Caskey never asked her again. (Sims

Dep. at 61). The last occasion involved Caskey asking Sims to join a church volleyball team

because they needed one more person and telling her that they would be the only ones at a

church practice. (Sims Dep. at 61). Although she considered herself a good volleyball

player, Sims told Caskey she was not interested and Caskey never mentioned it again. (Sims

Dep. at 61).

       7.     Nearly a year later, on July 24, 2003, Sims's immediate supervisor, Derrick

Bishop, informed Josh Rudd, the Human Resources Manager, that Sims had insinuated

harassment by Caskey after Caskey had criticized her for talking to employees in the

workplace and disrupting their work and the overall production. (Sims Dep. at 36). Sims

was aware that Caskey and her supervisor, Derrick Bishop, were friends. (Sims Dep. at 35).

Sims told Bishop that Caskey was asking her out and asked Bishop to tell Caskey that she

was not interested. (Sims Dep. at 35). Bishop went to Rudd to report what Sims told him.

(Sims Dep. at 35-36). That same day Rudd came to Sims to discuss the situation. (Sims

Dep. at 37; Rudd Aff. at Exh. 7). Sims told Rudd that Caskey was "giving her the third

degree about her holding his employees up" even though she had talked "a little" but no

worse than anybody else. The aforementioned inquiries about Sims's after work time all

occurred one year before Sims reported them, and by Sims's own admission, the only

concern she had in the past year was that Caskey had told her not to prevent his employees

from doing their jobs by disrupting them. (Sims Dep. at 36; Rudd Aff. at Exh. 7).  During

her July 24, 2003 meeting with Rudd, Sims never alleged any misconduct by Eddie Denson,

a supervisor under Caskey and over Sims in the chain of command.

  8. Despite the fact that Caskey's alleged "advancements" had ended over one

year earlier, Sims nevertheless filed an EEOC charge on September 10, 2003.   In addition

to naming Caskey, Sims also mentioned Denson for the first time in her EEOC charge,

although therein she did not allege that Denson directly harassed her, but rather simply

alleged that it was "widely known" that Denson is a "sexual pervert" who has had affairs with

co-workers, talked about sex, and she observed him "sniff" another employee. (Sims Dep.

at 80-89, 92-93; and Exh. D).

  9. Despite the fact that she did not allege in her EEOC charge filed in 2003 that

Denson harassed her personally, Sims testified during her deposition in January of 2005 as

to alleged misconduct by him toward her.  The Court agrees that Sims's deposition

testimony regarding Denson was confusing at best.  Sims testified that Denson talked to her

about oral sex; attempted to brush up against her; attempted to touch her legs; made

comments that she smelled good enough to eat; and stuck his tongue out at her.  (Sims Dep.

at 40).  Sims then conceded, however, that as of September 10, 2003, when she executed

her EEOC charge, the only thing Denson had done to her personally was that he "would just

stare at me, . . . just constantly watch me." (Sims Dep. at 88).  Sims also admitted that she

never reported any of Denson's alleged conduct to Rudd or to the EEOC. (Sims Dep. at 77-78, 92-93). Sims further testified that since her conversation with Rudd in July 2003, Denson has not done anything to her personally that she found offensive. (Sims Dep. at 140-41).

10.     On January 20, 2004, Sims informed Rudd that she had not been sexually harassed since filing the EEOC charges. (Sims Dep. at 107-08). Sims nonetheless argues, in her response to defendants' motion for summary judgment, that she was retaliated against by intimating, without substantiation, that she was transferred to an "undesirable job assignment." (Plaintiffs' Brief in Opposition at 6-7 and 52). Sims testified, however, that she was promoted after reporting the alleged misconduct and that she received favorable treatment from management regarding her attendance points. (Sims Dep. at 112, 142-145, and Exh. 8).

11.     On Monday, February 2, 2004, there was an incident in the plant where an employee, A. C. Williams, a family friend and co-worker of Sims, allegedly made an offensive gesture behind Sims's back. Mr. Rudd immediately contacted Sims. (Rudd Aff. at Exh. 12). Williams was called into the office and apologized to Sims. Sims touched him on the arm and indicated she was not mad and forgave him. (Rudd. Aff. at Exh. 15). Sims admits Williams apologized to her. (Sims Dep. at 116-117). Williams was written up and told that any future similar conduct would result in his immediate termination. (Rudd Aff. at 12-15). Sims admitted that she was aware of this discipline. (Sims Dep. at 118, 137). Sims said that she and Williams have had numerous work-related conversations since the

incident.       In a follow-up by Rudd on February 19, Sims said everything was okay, that

Williams was "truly sorry," that he looked "very sad" and that he would "drop his head"

when she came near him. (Sims Dep. at 120-121, 157;  Rudd Aff. at Exh. 17).  Sims

testified that the harassment procedure worked because Williams was "genuinely sorry."

(Sims Dep. at 151).

12.     The only other incident involving Sims occurred on April 5, 2004, when Sims

cursed at her supervisor, Tom Luker, and yelled that she had his "fucking life" in her hands.

(Sims Dep. at 122-124).  Sims testified that this bizarre tirade related to an incident over

one year earlier when Mr. Luker had accidentally struck Sims in the chest area as he turned

with a board in his hand. (Sims Dep. at 124-125).  The company once again investigated this

incident and found that Sims's allegation was baseless.  (Rudd Aff. at Exh. 20).[2]

## CORA ARMSTRONG

13.     Cora Armstrong, another of the plaintiffs in this case, began her

employment at the Frisco City plant on August 12, 1999.  (Armstrong Dep. at 27 and 95).

Armstrong used to work at the table saw with employees Regina McCaskill, Marshall

Gibbs, Shirley Roberts and Rashawnda Wallace.  (Armstrong Dep. at 40-41). Armstrong is

currently employed at Standard Furniture as an embosser making $8.25 per hour.

---

[2]On page 9 of Plaintiffs' Opposition Brief, Sims claims that after she complained about Caskey,
he banned her from the office and asked to see her breasts which he had hit with a board.  The
deposition pages cited by Sims in support of this allegation, however, establish that Sims actually
testified that Tom Luker was involved in the accident in which Sims was hit in March of 2003 (before
Sims ever complained) and that Tom Luker, not Caskey, advised her she couldn't go in the office.

14.     Armstrong was aware that Standard Furniture had a sexual harassment policy. (Armstrong Dep. at 48-50, 51).  In fact, she recalls going to meetings in October 2001 and May 2003 about the harassment policy.  (*Id*.).  Armstrong understood from these meetings that if she had a problem on the floor, she was supposed to report it to human resources. (*Id*. at 48-49).

15.     Armstrong did not, however, go to human resources to report any alleged harassment until the human resource manager, Josh Rudd, asked to meet with her. (Armstrong Dep. at 27).  Armstrong conceded that she never complained to Rudd or anyone else before the summer of 2003.  (Armstrong Dep. at 49-50).  On Monday, July 28, 2003, Rudd spoke to Armstrong in his office only because Sims had mentioned her in their conversation.  (Armstrong Dep. at 14 and Exh. 1).

16.     During this conversation with Rudd on July 28, 2003, Armstrong claimed that Caskey made two comments to her of a sexual nature: (1)  in July 2002, Caskey made a comment about handcuffing Armstrong to the bed, in response to which she admitted that she smiled and did not say anything (Armstrong Dep. at 14-15 and 53); and (2) in the Summer of 2002, Caskey commented about what kind of underwear Armstrong had on, which were sticking out and said "if you fall out, I'm going to get your panties and carry them around in my pocket" (Armstrong Dep. at 19).  Although, at one point, Armstrong alleged that the incident about her panties occurred six month's prior to the July 28, 2003, (Armstrong Dep. at 18-19), she later confirmed that it had occurred in the previous year when "it was hot, like July, June, July" (*Id*. at 53 and 54).  Armstrong thus conceded that

these incidents occurred nearly one year before her conversation with Rudd on July 28, 2003.  Armstrong also conceded that she refused to name any witness who could corroborate her claims.  (Armstrong Dep. at 15-20; Rudd Aff. at Exh. 7).  Armstrong also testified that she did recall ever asking Caskey to stop the allegedly offensive conduct.  (Armstrong Dep. at 20).

17.    After the meeting on July 28, 2003, Rudd spoke with Caskey about Armstrong's allegations.  Armstrong conceded that Caskey never said anything of a sexual nature to her after her conversation with Rudd on July 28, 2003.  (Armstrong Dep. at 28).  Armstrong also testified that she had a good working relationship with Caskey until she filed her EEOC charge.  (Dep. at 29).   Rudd followed up with Armstrong on January 20, 2004, at which time Armstrong admittedly told him: "I do not have any problems since I filed the charge.  No one has harassed me after the charges came out."  (Rudd Aff. at Exh. 10; Armstrong Dep. at 31).   Armstrong in fact admitted that, for almost two years, she sees Caskey "multiple times" each day and their conversations are businesslike.  (Armstrong Dep. at 38-39).

18.    Armstrong never went to Rudd to complain about Eddie Denson.  (Armstrong Dep. at 61-62). Armstrong also conceded that she did not even mentioned to Rudd during their meeting on July 28, 2003, that she ever had any problems with Denson harassing her.  (Armstrong Dep. at 77-78).  The first time Armstrong mentioned Denson to Rudd was when Rudd stopped by Armstrong's workstation to ask her how everything was going on May 13, 2004.  (Rudd Aff. at Exh. 21).  This was the first time Armstrong had ever made any

allegation against Denson and it consisted solely of the contention that Denson licked his

lips once, and that she did not even see it. (Id.) Rather, she said that Simpson told her about

it. (Id.) When asked why she did not report this to Rudd, Armstrong replied, "I just don't

pay him no attention. I just do my work and don't pay them any mind." (Rudd Aff. at Exh.

21). Rudd then talked to Simpson, who told him that Denson had licked his lips because

they were dry and she did not see any intentional or sexual conduct in the act. (*Id*.)

      19.    Although Armstrong testified that she felt free to report alleged conduct by

Caskey, Denson's supervisor, she nonetheless claimed that she did not report the alleged

conduct of Denson because she had "a feeling" that her employment would be terminated if

she reported Denson. (Armstrong Dep. at 37-38, 50). However, Armstrong has proffered

no evidence identifying any employee who complained about harassment by anyone and was

then fired. (Armstrong Dep. at 50).

      20.    Armstrong admitted that she was among a group of employees, including

Eddie Denson, who would eat lunch together every day. (Armstrong Dep. at 91). She

would share food with Denson. (Armstrong Dep. at 44-45). Periodically, Denson would

bring hot coffee out on the plant floor to her. (Armstrong Dep. at 46-47). Other members

of the group that ate lunch together were: Shirley Roberts, Marshall Gibbs, and Rashwanda

Wallace. (Armstrong Dep. at 91). Armstrong testified that she was friends with Shirley

Roberts, Marshall Gibbs, Regina McCaskill and Rashwanda Wallace and they would

frequently talk at work. (Armstrong Dep. at 40-41).

21.      Armstrong first denied that she spoke of sex with her friends at work. (Armstrong Dep. at 40-42, 46).  However, she admitted that Shirley Roberts, Regina McCaskill and Marshall Gibbs talked about sex all of the time, and that she would just laugh when they did say things about Denson or other sexual things.  (Armstrong Dep. at 56-57). Armstrong also ultimately conceded that she talked about her sex life with Regina McCaskill.  (Armstrong Dep. at 58-60).

22.      Armstrong denied having any sexual relationship with Denson.  (Armstrong Dep. at 40).  The evidence of record, however, contains the testimony of the four individuals identified by Armstrong as her friends regarding Armstrong's conduct in the workplace: two (Shirley Roberts and Marshall Gibbs) are still employed at Standard Furniture while two (Regina McCaskill and Rashanda Wallace) are no longer employed. All four worked within a few feet of Armstrong and spoke to her all day long.  All four testified not only that Armstrong bragged about her sexual relationship with Denson but about her blatant sexual conduct at work.   According to their testimony: (1)Armstrong directly admitted or implied a sexual relationship with Denson; (2) Armstrong frequently referred to Denson's penis as a "big old dick" that could put her in the hospital; (3) on a daily basis, at work, Armstrong rubbed Denson's crotch area and commented on the size of his flaccid penis; (4) on one occasion, she rubbed Denson and then ran to the bathroom as if she was "hot;" (5) Armstrong told fellow employees that she and Denson had had sex in her bathroom at home; (6) Armstrong would regularly do a dance, and back her rear-end into Denson; (7) Armstrong got angry when she observed Denson talking to another woman

11

(referred to by Armstrong as "that little old bitch") and was upset when their relationship ended; (8) Armstrong was never offended by any conduct in the workplace; and (9) Armstrong said she would share any money she received from this suit with Denson. (Roberts Dep. at 10-20; Gibbs Dep. at 8-20; McCaskill Dep. at 8-20; and Wallace Dep. at 9-21). All four witnesses testified not only that Denson never harassed Armstrong, but that they felt Armstrong harassed Denson. (Roberts Dep. at 13; Gibbs Dep. at 16). Furthermore, all four witnesses testified that Caskey never said anything offensive to them. In fact, they also testified that it was Armstrong who made a comment to Caskey about his private area, and Caskey just waved her off. (Roberts Dep. at 15-18; Gibbs Dep. at 16; McCaskill Dep. at 8-9).

23.     Although Armstrong denied it, McCaskill testified that Armstrong told her that she was down to her last dollar and the only way she could get money "was to sue" Caskey. (McCaskill Dep. at 16).

24.     As stated previously, Armstrong never reported any harassing conduct by Denson to Rudd, even when Rudd called Armstrong into his office on July 28, 2003, to talk about harassment. (Armstrong Dep. at 61-62, 77-78). Armstrong does not dispute that the first time she even mentioned Denson to Rudd was when Rudd stopped by her workstation on May 13, 2004, to ask how everything was going. (Rudd Aff. at Exh. 21). And the only thing Armstrong complained about at that time was that Denson licked his lips, conduct she did not even see but, rather, was told about by Simpson. Despite having never told either Rudd or the EEOC, Armstrong testified in her deposition that the following incidents

occurred: (1) Denson would tell her every day that he wanted to have sex with her (Armstrong Dep. at 61); (2) Denson would come over to her and touch her breasts and between her legs (*Id*. at 61-62); (3) Denson would come over to her when she was bending over and ask her to look at his penis while licking his lips (*Id*. at 62); and (4) Denson attempted to smell her legs (*Id*. at 63-64).  As offensive as this conduct appears, Armstrong not only failed to report it when it allegedly occurred, but even failed to mention it when Rudd directly inquired of her in January, March and May of 2004 if she was continuing to be harassed.  During each of these conversations, Armstrong told Rudd that everything was alright, adding only one comment about the time Simpson told her Denson was licking his lips.  (Armstrong Dep. at 61-65, 69).  Armstrong conceded that she never reported or complained about the conduct she first revealed in her deposition.  (Armstrong Dep. at 62). Armstrong also testified that she believed Denson did not think she would have a problem with his conduct, or complain about it, because they were friends.  (Armstrong Dep. at 66).

### KINNIE SIMPSON

25.     Kinnie Simpson, the last plaintiff in this case, was employed as an embosser at Standard Furniture and had been with the company since February 2000.  She worked in an area near Armstrong.  Simpson testified that she recently resigned due to problems with her children and a divorce.  (Simpson Dep. at 66-69).

26.     Simpson was aware that Standard Furniture had an anti-harassment policy and testified that she reviewed it in 2000.  (Simpson Dep. at 69-71).

27.     Simpson testified that she is not making a claim for assault and battery and invasion of privacy against either Eddie Denson or Tom Caskey.  (Simpson Dep. at 89-90). Simpson testified that Caskey was always a gentleman to her.  (Simpson Dep. at 70-71). Simpson never observed Caskey acting inappropriate.  (Simpson Dep. at 70-71).  She testified that she thought Caskey was "a very good supervisor and very much on top of things in the shop plant."  (Simpson Dep. at 20).

28.     Simpson admits that she has not been directly harassed by Denson. (Simpson Dep. at 21).  Simpson also testified that she deals with Denson about her work only and had not been harassed by Denson. (Simpson Dep. at 21).  Simpson specifically agreed that she told Steve Pond, the Director of Human Resources, that "Denson does not act playful with her because he knows that she is not one to be playful at work." (Simpson Dep. at 21-22).  According to Simpson, Denson had never inappropriately talked to her and she has never had any problems with him.  (Simpson Dep. at 22-23).   Simpson also conceded that, had Denson ever talked to her inappropriately, she could easily have stopped it by telling Denson to stop, and that, if it continued, she would have complained and asked for assistance under the harassment policy.  (Simpson Dep. at 22).

29.     According to Simpson, she is in this lawsuit as a "witness" to allegedly support Armstrong.  However, Simpson described how Denson and Armstrong acted "playfully" at work and testified that, from what she observed, they were "getting along." (Simpson Dep. at 24).  Simpson said that Armstrong and Denson would frequently "walk away from each other in a laughing manner."  (Simpson Dep. at 30).  Simpson also testified

14

that the entire group in that area - Roberts, Gibbs, McCaskill and Armstrong - had lunch

together, laughed and joked daily.  Simpson also heard that Armstrong had exposed herself

and that Armstrong and Denson were in a relationship.  (Simpson Dep. at 32-36, 38-39).

Simpson also testified that, after Armstrong filed her EEOC charge, Armstrong and Denson

were "strictly business," but after a few months, they began talking "playfully" again.

(Simpson Dep. at 40-41, 43-44).

    30.    Although Simpson did not know anything about Sims's allegations of sexual

harassment, she knew that Sims was upset at Caskey's admonishing her for talking to co-

employees because Sims had told her that she was upset by this.  (Simpson Dep. at 82).

## CONCLUSIONS OF LAW

1.    **<u>Summary Judgment Standard</u>**

    Defendants are entitled to summary judgment "if the pleadings, depositions, answers

to interrogatories and . . . affidavits . . . show that there is no ***genuine*** issue as to any

***material*** fact and that [the defendants are] entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c)  (emphasis added).  Under Rule 56(c):

> A factual dispute is "genuine" if the evidence is such that a
> reasonable jury could return a verdict for the non-moving party.
> A fact is "material" if it might affect the outcome of the suit
> under governing substantive law.

*Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Where the record taken as a whole

could not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for

15

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the plaintiff fails to produce sufficient evidence to

raise a genuine issue of material fact on the existence of an essential element of their

claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp.

V. Lomelo,* 929 F.2d 633, 636 (11th Cir. 1991). In considering defendants' motions for

summary judgment, the Court views the facts presented, together with all reasonable

inferences arising from the facts, in the light most favorable to the plaintiffs. *Adickes v.

S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723

(11th Cir. 2004). As the moving party, the defendants have the initial burden of showing the

absence of a genuine issue of material fact. *Id.* Once the defendants make that showing,

the burden shifts to the plaintiff to "come forward with *specific* facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986).

Confronted with a properly supported motion for summary judgment, the plaintiff must

adduce admissible evidence which creates a material factual dispute. *Clarke v. Coats &

Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).   Plaintiff must do more than "simply show

there is some metaphysical doubt as to the material facts." *Anderson,* 477 U.S. at 251-52.

She must produce evidence. *Id.*

     2.   **Standard Furniture: Hostile Environment Claims**

In this litigation, plaintiffs do not assert, and have presented no evidence of, *quid

pro quo* harassment, namely harassment by a supervisor which resulted in a tangible

employment action such as discharge or demotion. *See e.g., Burlington Industries, Inc. v.*

*Ellerth*, 524 U.S. 742, 761 (1998)("Defined tangible employment action as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").   Plaintiffs here assert a claim under Title VII for a hostile environment.

In *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002), the Eleventh Circuit set forth the elements necessary to support a hostile environment claim:

> Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e- 2(a)(1). A hostile work environment claim under Title VII is established upon proof that "the workplace is ***permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment***." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the ***harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment***; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

277 F.3d at 1275 (emphasis added).   *See also*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (applying these factors in the context of a hostile environment sexual harassment claim).   The EEOC Guidelines describe the kinds of workplace conduct that

17

may be actionable under Title VII as "sexual harassment" to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986), *quoting*, 29 CFR § 1604.11(a) (1985).  The Guidelines further provide, however, that such sexual misconduct constitutes prohibited "sexual harassment" only "where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment'." *Id.*, *quoting*, 29 CFR § 1604.11(a)(3).

Consequently, the fourth element, whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that tests the legitimacy of most harassment claims and is therefore regarded as crucial. *See, Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *citing,  Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).    Only when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment," is the law violated. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), *quoting*, *Meritor,*  477 U.S. at 67.

The employee must, therefore,  make both a subjective and an objective showing in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment.   *Mendoza*, 195 F.3d at 1246. The

employee must establish not only that she subjectively perceived the environment as

hostile and abusive, but also that a reasonable person would perceive the environment to be

hostile and abusive. *Gupta*, 212 F.3d at 583, *citing*, *Mendoza*, 195 F.3d at 1246. The

objective severity of harassment should be judged from the perspective of a reasonable

person in the employee's position, considering all of the circumstances. *Mendoza*, 195

F.3d at 1246, *citing*, *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 81

(1998).

In determining whether the harassment objectively altered an employee's terms and

conditions of employment, the following four factors should be considered: (1) the

frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is

physically threatening or humiliating, or a mere offensive utterance; and (4) whether the

conduct unreasonably interferes with the employee's job performance.  *Id*.   *Mendoza*, 195

F.3d at 1246, *citing*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997).  The

conduct must be examined in context, not as isolated acts, and the severity and

pervasiveness of the conduct it must be judged under the totality of the circumstances.

*Allen*, 121 F.3d at 647.  *See also*, *Harris*, 510 U.S. at 23; *Henson*, 682 F.2d at 904;

*Faragher*, 524 U.S. at 787-88.

As applied to this case, it cannot be disputed that Kinnie Simpson asserts no claim

that she was ever harassed by either Caskey or Denson.  (Simpson Dep. at 21-23 and 70-

71).  Although characterized by Sadie Sims as sexually harassing conduct, the contention

that Caskey asked Sims on one occasion what she was doing after work, and on another to

19

teach him Spanish after work, and on a third to join his church volleyball team simply does

not objectively constitute conduct of a sexual nature, or even general harassment in light of

Sims' admission that he never asked her again after she rejected his invitations.  The

allegations asserted by Sims against Denson are, in addition to being very suspect because

they were first raised in her deposition and never presented to either Standard Furniture or

the EEOC, even more vague in light of the inconsistencies in her deposition testimony.  For

example, Sims first testified that Denson talked to her about oral sex; attempted to brush up

against her; attempted to touch her legs; made comments that she smelled good enough to

eat; and stuck his tongue out at her (Sims Dep. at 40), but then conceded, *inter alia*, that

since her conversation with Rudd in July 2003, Denson had not done anything to her

personally that she found offensive.  (Sims Dep. at 140-41).

Although the nature of some of the conduct about which Armstrong testified during

the latter portion of her deposition, namely that Denson would tell her that he wanted to

have sex with her, would touch her breasts and between her legs, would ask her to look at

his penis while licking his lips, and attempted to smell her legs, cannot honestly be

characterized as "normal day-to-day interactions between members of the opposite sex,"

the crudeness of the alleged behavior does not itself establish that the conduct was either

harassing within the meaning of the law or sufficiently severe or pervasive so as to alter the

plaintiff's terms or conditions of employment.  The law is clear that not all offensive

conduct, however inappropriate or vulgar, is unlawful conduct.  *See e.g., Jones v. Clinton*,

909 F. Supp. 657, (E.D. Ark. 1998) (hand on leg moving towards pelvis, attempted kiss and

20

exposure of genitals, "while boorish and offensive" . . . is not so severe and pervasive . . . to

have altered condition of employment and created an abusive environment.).   To cross the

line to unlawful conduct, offensive conduct  must be sufficiently severe and pervasive to

alter the conditions of employment and create an abusive working environment.  *Meritor,*

477 U.S. at 67.   The sporadic incidents complained of by the plaintiffs in the case at bar do

not cross the line under this analysis.    Compare the following authorities which failed to

find an unlawfully hostile environment under factual allegations similar or far worse than

those made by the plaintiffs:  *Hockman v. Westward Comm. LLC*, 122 Fed.Appx. 734,

2004 WL 2980351 (5th Cir. 2004) (grabbing breasts and "behind" not severe conduct).

*Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003) (grabbing

buttocks "with force" did not satisfy high threshold of actionable hostile environment);

*Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993) (placing hand on leg

above the knee, rubbing upper thigh, kissing and lurching at her did not create an objectively

hostile environment).  *See also Mendoza v. Bordon,* 195 F.3d 1238, 1246-47 (11th Cir.

1999) (detailing additional cases).

   In addition, plaintiffs' failure to complain or otherwise protest the alleged conduct

at issue in this case at the time it allegedly occurred suggests that they did not, for whatever

reason, perceive the conduct as offensive at the time.  *See e.g.*, *Paraohao v. Banker's*

*Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the

[plaintiff] by her conduct indicated that the [complained--of behavior] was unwelcome."),

*quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986).  In the present case,

Sims said nothing until nearly a year after Caskey asked the three questions asserted as harassment by Sims, and then only after Caskey had criticized her for talking to employees and disrupting their work and the overall production. (Sims Dep. at 36). Sims never complained to Standard Furniture about Denson and, although she described him as a "sexual pervert" to the EEOC, she never asserted that Denson personally harassed her in any way.

Similarly, Armstrong never complained until Josh Rudd, the Human Resources Manager, approached her on July 28, 2003, and then merely asserted that Caskey had made two comments to her of a sexual nature the previous summer, the first in July of 2002 about handcuffing her to a bed, and the second also during the Summer of 2002 about her underpants. Armstrong refused to identify any witnesses and conceded that she did not recall ever telling Caskey to stop the allegedly offensive conduct. (Armstrong Dep. at 20). Armstrong also conceded that Caskey never said anything of a sexual nature to her after her conversation with Rudd on July 28, 2003. Despite that fact, Armstrong never went to Rudd to complain about Denson. The first time Armstrong mentioned Denson to Rudd was when Rudd stopped by Armstrong's workstation to ask her how everything was going on May 13, 2004, and she told him simply that Simpson told her Denson licked his lips once. When asked why she did not report this to Rudd, Armstrong replied, "I just don't pay him no attention. I just do my work and don't pay them any mind."

Finally, Simpson denies ever having been harassed at Standard Furniture. She conversely testified that Caskey was always a gentleman to her and she never observed him

acting inappropriate.  Simpson also admits that she has never been harassed by Denson.

According to Simpson, "Denson does not act playful with her because he knows that she is

not one to be playful at work." (Simpson Dep. at 21-22).

      The courts which have analyzed similar complaints to that of at least Armstrong,

have consistently found such conduct to be below the threshold required to demonstrate an

unlawful hostile environment.  In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir.

2000), the plaintiff complained of several incidents of alleged sexual harassment including

an occasion when "he just rolled his chair and came close to me and put his hand on my

right thigh" and another when he rolled his chair toward the plaintiff and said "what kind of

material is that?" as he lifted the hem of her dress about four inches.  She claimed the

supervisor called her at home repeatedly asking questions about her personal life .  There

were also other reported comments made during the same time period that the plaintiff felt

were inappropriate and contributed to the hostile environment.  All of the statements and

actions about which she complained occurred during a period of six or seven months.  *Id.* at

579.  After examining  the totality of the circumstances reported by the plaintiff in *Gupta*,

the Eleventh Circuit found that no hostile work environment was created by the supervisor.

The court noted that during the entire period the plaintiff and supervisor were interacting,

each incident was only momentary and neither alleged incident of touching was coupled

with any verbal suggestions or advances.  The Eleventh Circuit in *Gupta* held:

    . . . we conclude the conduct and statements in question would not have
    interfered with a reasonable employee's performance of her job. . . . the
    alleged harassment in this case exemplifies "the ordinary tribulations of the

> workplace," which the Supreme Court and this Court have held do not
> constitute actual sexual harassment. [The plaintiff] failed to present evidence
> that [the defendant's] conduct was in any way physically threatening or
> humiliating," or that a reasonable person would view the conduct as "severe."

(Citations omitted). *Id.* at 586. There is certainly no evidence that the alleged conduct in this case was perceived by any of the plaintiffs as physically threatening or that it interfered in any way with the performance of any of the plaintiff's jobs. Any reasonable person, male or female, would not find the conduct that purportedly occurred to be severe or pervasive. See *Hockman v. Westward Comm., LLC*, 2004 WL 2980351 (5th Cir. 2004) (grabbing or brushing breasts and "behind" not severe conduct). See *Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003) (allegations including grabbing buttocks "with force" didn't satisfy high threshold of actionable hostile environment).

Even if it could be said that the plaintiffs demonstrated an unlawful hostile environment, they cannot prevail because there exists no genuine issue that Standard Furniture "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that plaintiffs "unreasonably failed to take advantage of any preventative or corrective opportunities . . . or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). All three plaintiffs admitted that they knew about the company's policy and how to report harassment. Despite plaintiffs' unsubstantiated opinions to the contrary, Standard Furniture, through it's anti-harassment policy, "exercised reasonable care to prevent harassment." *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997). Sims admitted that since her conversation with Rudd in July of 2003, Denson had done nothing to her personally that she found offensive. Sims also admitted that the conduct by Caskey about which she complained to Rudd in July of 2003, had occurred in July of 2002 and had not been repeated. As stated previously, Simpson

never complained because she was never harassed.  Despite some inconsistencies in her

testimony, Armstrong admitted that Caskey never said anything of a sexual nature to her

after her conversation with Rudd on July 28, 2003.  It is also undisputed that, although

Armstrong complained about Caskey, Denson's supervisor, she never reported any conduct

by Denson except one incident when she was told by someone else that Denson licked his

lips.

The record is clear that the plaintiffs unreasonably failed to take advantage of

preventative opportunities to avoid harm.  Sims and Armstrong failed to report any

objectionable conduct for a year.  Their only excuse was that they were afraid to report it

but they offers no basis for their fears.  The Court agrees that this is insufficient to excuse

failure to follow a policy.  *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272,

1288 (11th Cir. 2001).

3.    **Standard Furniture: Retaliation Claims**

To establish a prima facie case of retaliation under Title VII, plaintiffs must prove

the following:  (1) they participated in an activity protected by Title VII; (2) they suffered

an adverse employment action; (3) there is causal connection between the participation and

the protected activity and the adverse employment decision.  *Gupta v. Florida Bd. of

Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (citing *Farley v. Nationwide Mut. Ins.,* 197

F.3d 1322, 1336 (11th Cir. 1999)).  Nothing in plaintiffs' description of the alleged

transgressions against them after they reported allegedly harassing conduct amounts to an

"adverse employment action" sufficient to establish a retaliation claim.  The courts have

defined "adverse employment action" as requiring an "ultimate employment decision"  or a

serious and material change in the terms, conditions or privileges of employment.  *Davis v.

Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001); *Gupta v. Florida Board of Regents*,

212 F.3d 571, 587 (11th Cir. 2000). An adverse employment action must constitute "a

significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761

(1998).

 In *Merriweather v. Alabama Dept. of Public Safety,* 17 F. Supp. 2d 1260, 1274

(M.D. Ala. 1998), *aff'd* 199 F.3d 443 (11th Cir. 1999), the plaintiff alleged that in

retaliation she was given negative job evaluations, written counseling statements and

limitations on assignments.  The court dismissed the claim on summary judgment,

concluding:

> Merriweather has alleged no loss of pay, benefits, job classification, or
> change of duties as a result of this alleged retaliation.  Considering this
> evidence in the light most favorable to the plaintiff, this court finds that the
> evidence is insufficient to support...an adverse employment action.

17 F.Supp. at 1274-76.  The court held that an employment action involving no appreciable

change in working conditions simply cannot constitute an adverse employment action.  17

F. Supp. 2d at 1276.  "Otherwise, every trivial personnel action that an irritable, chip-on-the-

shoulder employee did not like would form the basis of a discrimination suit." *Whitehead

v. Norfolk S. Ry.,*  53 F.Supp. 2d 1380, 1383 (M.D. Ga. 1999) (quoting *Williams v. Bristol-

Myers Squibb Co.,* 85 F.3d 270-74 (7th Cir. 1996)).

 As applied to the case at bar, nothing in plaintiffs' description of the alleged

transgressions against them after they reported allegedly harassing conduct amounts to an

"adverse employment action" sufficient to establish a retaliation claim.   In point of fact,

plaintiffs argue only that Sims was "singled out and harassed by Caskey in retaliation for her

original complaints about his behavior [and that] Caskey interfered with her ability to

perform her job." (Plaintiffs' Opposition Brief at 52). Plaintiffs have proffered no evidence to support this argument. To the extent that Sims intimates in her arguments that she received an undesirable transfer, such is refuted by her testimony that she in fact was not only promoted but received other favorable treatment. (Sims Dep. at 112, 142-145; Exh. 8). Neither Simpson nor Armstrong has even asserted, let alone proffered any evidence, that she suffered any adverse employment action. Consequently, plaintiffs have failed to establish a prima facie claim of retaliation and defendants are entitled to summary judgment on such claims.

       4.      **State Law Claims: Invasion of Privacy, Assault and Battery, Outrage**

Plaintiffs Armstrong and Sims commence their argument concerning their state law claims with the contention that there is a sufficient basis for holding Standard Furniture liable for the actions of its employees, Caskey and Denson.[3] Plaintiffs have, however, failed to establish that either Caskey or Denson are in fact liable themselves for any violation of state law.[4]

---

[3]As stated previously, Simpson conceded during her deposition, understandably, that she was **not** asserting an invasion of privacy claim or an assault and battery claim against either Caskey or Denson. (Simpson Dep. at 89-90).

[4]Even if it could be said that plaintiffs met their burden concerning the state law claims against the individual defendants, there is no evidence from which to impose liability on Standard Furniture. Under Alabama law, an employer is liable for the intentional torts of its employee only if the Plaintiff can prove: "(1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts." Ex Parte Atmore Community Hospital v. Hayes, 719 So.2d 1190, 1194 (Ala. 1998). Plaintiffs have failed to proffer any evidence that the alleged behavior by Denson or Caskey occurred in furtherance of Standard Furniture's business.

### a.      Invasion of Privacy

Alabama has acknowledged the tort of invasion of privacy.  *Phillips v. Smalley Maintenance Services*, 435 So.2d 705 (Ala. 1983).  The Alabama Supreme Court, adopting the Restatement (Second) of Torts (1977), described four distinct wrongs pursuant to which a claim for invasion of privacy might be created: "1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use."  *Id.* at 708.  As applied to the present case, plaintiffs rely solely on the contention that the individual defendants intruded upon their physical solitude.

In order to maintain an action for invasion of privacy, this Court agrees that the defendant must actually intrude on the plaintiff's private life.  To claim intrusion upon physical solitude or seclusion, the plaintiff must show that the defendant "sought or obtained any private information about her, or that he intruded upon her 'physical solitude or seclusion' by seeking any information that he did not properly have access to through his role as her supervisor…."  *Gary v. Crouch*, 867 So.2d at 318.   The interaction in the mill does not rise to the level of invasion of privacy:

> **[T]here must be something in the nature of prying or intrusion** and the intrusion must be something which would be offensive or objectionable to a reasonable person.  The thing into which there is intrusion or prying must be, and be entitled to be, private.  Two primary factors are considered in determining whether or not an intrusion which effects access to private information is actionable.  The first is the means used.  The second is the defendant's purpose for obtaining the information.

*Hogin v. Cottingham*, 533 So.2d 525 (Ala. 1988) (emphasis added). For example, the Alabama Supreme Court found invasion of privacy when over the course of three months, an employer locked an employee in an office and interrogated her, demanding that she tell him explicit details of her sex life with her husband, including the frequency of sex and positions they used. *Phillips v. Smalley Maintenance Services,* 435 So.2d 705 (Ala. 1983). Only where there is conduct intended to learn intimate details of the plaintiff's personal life can invasion of privacy occur.

Sims does not allege that Caskey intruded upon her physical solitude by seeking information that he did not properly have access to. In fact, there was no inquiry into Sims personal life. The mere action of asking a co-employee to socialize after work clearly is not an invasion of privacy. *McIsaac*, 495 So.2d at 650. In *McIsaac*, the Alabama Supreme Court found that the Plaintiff who had been asked out on numerous occasions, touched, almost kissed by her employer did not have a cause of action for invasion of privacy. *Id.,* 495 So.2d at 650. In *McIsaac,* there was no inquiry into the plaintiff's personal life; it was simply a request of sex. In so holding, the Alabama Supreme Court noted that "[e]ven the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability." *Id.,* 495 So.2d at 650. Likewise, in the current case, Caskey asking Sims to socialize, or teach him Spanish, or play volleyball after work does not state a claim for invasion of privacy. Similarly,

29

Armstrong's contention that Caskey made two comments to her of a sexual nature in the Summer of 2002, one suggesting handcuffing her to a bed and the other about her exposed underwear, does not state an invasion of privacy claim as such comments contain no inquiry into anything, private or otherwise.  Armstrong has conceded that Caskey never said anything else of a sexual nature after she complained about these two statements to Rudd on July 28, 2003.  (Armstrong Dep. at 28).  Neither Sims nor Armstrong have proffered any evidence that Caskey or Denson ever sought information that he did not properly have access to or ever made any inquiry into Sims' or Armstrong's personal life.  Defendants are, therefore, entitled to summary judgment on the invasion of privacy claims.

**b.      Assault and Battery**

In order to succeed on their assault claims against Caskey and/or Denson, Sims and Armstrong must each establish: (1) that Caskey and/or Denson touched her; (2) that Caskey and/or Denson intended to touch her; and (3) that the touching was conducted in a harmful or offensive manner.  *Ex parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998).   A successful assault becomes a battery, which consists of the touching of another in a hostile manner. *Wright v. Wright*, 654 So.2d 542, 544 (Ala. 1995), *citing*, *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986), and *Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).  A key element of the tort of battery is that "the touching was conducted in a harmful or offensive manner."  *Atmore Community Hosp.*, 719

30

So.2d at 1194.  The Alabama Supreme Court noted that, in order to establish that the

defendant committed an battery, there must be substantial evidence that the alleged

touching occurred with sexual overtones and was unwelcome.  (*Id*.).

As applied to this case, no evidence has been proffered that Sims was ever

touched in any manner, let alone the requisite hostile manner, by either Caskey or

Denson.  Simpson, as stated previously, conceded that she was not asserting an

assault and battery claim.

Armstrong is the only plaintiff who contends that she was touched by

Denson, not Caskey, but has failed to proffer any evidence that the touching was

hostile or unwelcome. Although Armstrong denies ever having had an affair with

Denson, she admitted that she was among a group of employees, including Denson,

who ate lunch together every day, that she would share food with Denson, that

periodically he would bring coffee to her out on the plant floor.  The record also

contains the testimony of four of the individuals in that group, individuals identified

by Armstrong as her friends, to the effect, *inter alia*, that Armstrong directly

admitted or implied a sexual relationship with Denson, would rub Denson's crotch

area on a daily basis and comment on the size of his flaccid penis, got angry when

she observed Denson talking to another woman, and was upset when her relationship

with Denson ended.  It is also undisputed that Armstrong failed to complain or

otherwise protest Denson's alleged conduct at the time it occurred, which clearly

suggests that she did not, for whatever reason, perceive the conduct as offensive at

31

the time.  *See e.g.*, *Paraohao v. Banker's Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained--of behavior] was unwelcome."), *quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986).  In light of all the evidence of record, there is simply insufficient evidence in this record from which a jury could conclude that Armstrong subjectively believed at the time Denson's conduct occurred that it was offensive or that she perceived it to be "sexually harassing."  Defendants are, therefore, entitled to summary judgment on the assault and battery claims.

### c.    Outrage

The Alabama Supreme Court first recognized the tort of outrage in *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala. 1981).  The court established that in order to recover, the plaintiff must prove that the defendant's conduct was extreme enough to cause severe emotional distress sufficient to constitute a tort.  The court limited the action as follows:

> **The emotional distress must be so severe that no reasonable person could be expected to endure it.**  Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme…By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Inmon*, 394 So.2d at 365 (citations omitted) (emphasis added).   "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," which will not support a claim of outrage.  *Inmon*, 394 So.2d at 365.

The Court has only recognized the tort of outrage in three specific scenarios: 1) wrongful conduct in the family-burial context; 2) barbaric methods employed to coerce an insurance settlement; and 3) egregious sexual harassment.  *Potts v. Hayes*, 771 So.2d 462, 465 (Ala. 2000).   To recover, a plaintiff "must demonstrate that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'"  *Potts*, 771 So.2d at 465 (citations omitted).

For the reasons stated above, plaintiffs have failed to proffer any evidence that Caskey or Denson were guilty of any extreme or outrageous conduct.   Nor have plaintiffs established that Caskey or Denson either intended to, or did, inflict any emotional distress on any of the plaintiffs.   Nor have plaintiffs proffered any evidence of the existence of severe stress related to any conduct by Caskey or Denson. Again, plaintiffs' failure to complain under the circumstances presented in this case illustrates the lack of outrageous conduct.

### d.    Negligent Supervision and Retention.

A claim of negligent supervision is stated as follows:

> 'In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been

33

brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.'

*Armstrong Bus. Servs. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001), *quoting*,

*Big B, Inc. v. Cottingham*, 634 So.2d 999, 1003 (Ala.1993); *Lane v. Central Bank of*

*Alabama, N.A.*, 425 So.2d 1098, 1100 (Ala.1983); and *Thompson v. Havard*, 285 Ala.

718, 725, 235 So.2d 853 (1970). "Wanton supervision" requires that the employer

wantonly disregard its agent's incompetence, under the circumstances noted in *Big B.*

Armstrong, *817 So.2d at 682.*

For the reasons stated above, plaintiffs have proffered no evidence to support

any claim of either negligent supervision or retention. Sims and Armstrong admit that

they never reported any misconduct by Denson. The company investigated their

complaints against Caskey and found no merit. Simpson admitted she was never

harassed by anyone. Plaintiffs have failed to establish the existence of severe or

pervasive sexual harassment such that Standard Furniture would be on notice of any

incompetence by Caskey or Denson.   Accordingly, Plaintiffs fail to allege any conduct which could support a claim for negligent supervision or retention.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that defendants' motions for summary judgment are due to be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, Standard Furniture, Thomas Caskey, and Eddie Denson, and against the plaintiffs, Cora Armstrong, Sadie Sims and Kinnie Simpson, the plaintiffs to have and recover nothing of the defendants.  Costs are taxed against the plaintiffs.

**DONE** this 22nd  day of August, 2005.

_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE